Filed 2/17/26  In re K.L. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re K.L., a Person Coming Under the Juvenile Court Law. | C103216 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.M.,<br><br>Defendant and Appellant. | (Super. Ct. No. 22JV3228901) |

Appellant J.M., mother of the minor K.L., appeals from the juvenile court's orders denying her petition for modification, terminating parental rights, and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 388, 395.)[1]  Mother claims the juvenile court abused its discretion when it denied her petition for modification and erred by

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

finding the beneficial parental relationship exception to adoption did not apply.  We will affirm the juvenile court's orders.

BACKGROUND

*Original Petition*

The minor (then two years old) was initially removed from the custody of mother and father B.L. (father) in May 2022 due to the parents' alcohol abuse and acts of domestic violence in the minor's presence.  The Shasta County Health and Human Services Agency (Agency) filed a dependency petition pursuant to section 300, subdivisions (b) and (g), describing a particular incident during which mother was intoxicated while driving and father was reaching into the car attempting to turn off the ignition.  Mother dragged father approximately 50 feet while he was holding the minor in his arms until father, fearing he would drop her, threw the minor into the car.  Mother was arrested.  However, the following day, she declined to drug test and claimed not to know the minor's whereabouts.  Law enforcement officers eventually found the minor with the maternal grandmother, who was hiding with the child in the bathroom.  The petition also alleged father was briefly incarcerated at the county jail after becoming heavily intoxicated, purposely crashing his car in an attempt to kill himself and then shooting at responding officers.  The juvenile court ordered the minor detained.

The combined jurisdiction and disposition hearing took place over many months.  During that time, the juvenile court allowed for liberal overnight visitation and the minor spent the majority of her time in the parents' home.  The court eventually took jurisdiction over the minor in January 2024—over a year and a half after the minor's detention.  Later that month, the court ordered the minor returned to the parents' custody with family maintenance services, including a 52-week batterer's program.

*Supplemental Petition (Section 387)*

On March 4, 2024, the Agency filed a supplemental petition pursuant to section 387 alleging the parents had regressed in their behaviors in that they were unwilling to

2

maintain physical boundaries, amicable co-parenting, or a domestic violence-free environment for the minor. The supplemental petition alleged mother stole father's house key without permission, "trashed" his apartment, strung his belongings throughout the home, cut his router cables after father spoke with mother's boyfriend, loaned a vehicle to father and then reported it stolen, and refused to turn the minor over to father at an agreed-upon time. Father slashed mother's tires because she refused to reconcile with him even though she allowed him to sleep on her couch while he waited for a new apartment.

The parents continued to demonstrate the same behaviors leading to the minor's initial detention and the domestic violence continued to escalate despite the array of services offered, placing the minor at risk of emotional and physical harm. Mother was evading the social worker, limiting the Agency's ability to adequately assess the minor's safety and causing concern that mother would hide the minor from the Agency and law enforcement. The Agency recommended the minor be removed from parental custody.

On March 5, 2024, the juvenile court ordered the minor detained with supervised visitation and reunification services for the parents, including the 52-week batterer's program previously ordered along with random drug testing, individual counseling, and psychological evaluations for both parents. The minor was placed with the paternal grandparents.

*Section 387 Jurisdiction and Disposition Report*

In its section 387 jurisdiction and disposition report, the Agency reported that mother tested negative for all substances on March 5, 2024, and completed the recommended classes and an alcohol and other drug assessment. Mother stopped seeing her therapist and informed the social worker she would not complete the co-parenting counseling because she had "misused the tools she had learned in the course" when she invited father to stay at her home. Visitation reportedly went well. When visits ended, the minor told the social worker she wanted to go home with mother. However, the

3

Agency expressed its "grave concerns" regarding the increasing domestic violence between the parents. The Agency recommended the court set the matter for a section 366.26 hearing.

*Hearing on Jurisdiction, Disposition, and Change of Placement*

At the March 21, 2024 hearing on jurisdiction and disposition for the amended section 387 petition and request for change of placement, the juvenile court found the previous family maintenance services had not been effective. The domestic violence between the parents continued to place the minor at substantial risk of harm as evidenced by the facts alleged in the supplemental petition and the parents filing opposing requests for domestic violence restraining orders. The court took judicial notice of the related domestic violence cases, heard testimony from both parents, and continued the hearing to April 11, 2024.

*April 2024 Addendum Report*

In an addendum report filed April 24, 2024, the Agency provided the results of mother's psychological evaluation. The evaluator, Dr. Lea Tate, recommended mother restart individual therapy to discuss, among other things, how domestic violence affected her and the minor; restart posttraumatic stress disorder (PTSD) treatment; participate in medication management and comply with any recommended medication regimen; participate in domestic violence education; and maintain the restraining order against father.

*Continued Hearing on Jurisdiction, Disposition, and Change of Placement*

The hearing on jurisdiction, disposition, and change of placement continued over a number of days in April and May 2024. On May 3, 2024, the juvenile court sustained the allegations in the amended supplemental petition and found that while mother made some progress toward alleviating or mitigating the causes necessitating the minor's placement, she had not been able to demonstrate the skills necessary to safely co-parent, had not shown she benefitted or learned from her case plan services, did not abide by the agreed-

4

upon safety plan, and continued to engage in domestic violence with father. The court ordered the minor removed from the parents' custody and terminated mother's services, finding she completed the majority of the case plan but was unable to show a benefit from those services, she failed to abide by the agreed-upon safety plan, she had not been able to demonstrate the skills necessary to safely co-parent the minor, she had reached the maximum allowable reunification time, and there was a low probability of return of the minor to her care. The court also set a section 366.26 hearing.

*Section 366.26 Report*

The Agency's section 366.26 report stated mother's visits with the minor initially went well. Prior to the filing of the section 387 supplemental petition, mother was compliant with supervised visitation and progressed to unsupervised visits in her home. The minor visited on weekday evenings and all day on Sundays, with one to two weekly overnight visits. Mother was engaged and appropriate during visits. The minor willingly went to mother at the start of each visit and fussed when she had to say goodbye, although she willingly reached for Agency staff when it was time to leave. However, at some point, the paternal grandparents reported that the minor had begun using "colorful language," including saying "Mommy hates you" and screaming "NO!" following visits with mother. The minor also repeatedly told others "scary Mommy" and "Mommy hits on the face." Mother reported not knowing where the minor got that from, stating she suspected the paternal grandparents planted those thoughts in the minor's head.

Prior to the minor's detention on the section 387 supplemental petition, the parents continued to have domestic violence incidents in front of the minor. Since detention, the minor had been displaying signs of stress such as bed wetting, stuttering, moodiness, angry outbursts, and crying before and after visits. The paternal grandparents reported the minor was "mean, sassy, and defiant" after visits with mother and she continued to have toileting issues at night. The minor was, however, doing well in her placement with the paternal grandparents, who provided her with "excellent care" and were meeting all

5

her needs. The minor appeared secure in their care and sought them out for comfort and affection. Mother's monitored visitation at the child welfare office was reduced in August 2024 to just once a month. The Agency recommended termination of parental rights with a permanent plan of adoption.

*Mother's Petition to Modify Court Order (Section 388)*

On August 15, 2024, mother filed a petition to modify the juvenile court's order terminating her reunification services, seeking return of the minor to her custody or reinstatement of reunification services and unmonitored visits with an increase in frequency and duration. Mother argued she successfully completed a domestic violence program in September 2022, completed a psychological evaluation by Dr. Tate after which Dr. Tate recommended further services but concluded mother's "diagnosis" did not prevent her from caring for and having custody of the minor, and successfully completed a parenting program. Mother further argued that, at the time the minor was detained pursuant to the original petition, mother was arrested for driving under the influence but not for any of the acts alleged in the petition or the Agency's reports. She argued she secured a job as a registered nurse, which allowed her to financially provide for the minor, and she had been granted a permanent restraining order against father in June 2024, allowing her to protect herself and the minor from father's continued display of violence against her. Mother also argued the requested change was in the minor's best interests because the minor was deeply bonded to her and would benefit emotionally from what mother learned in her various counseling programs by being parented and having extended contact with mother.

*Agency's Opposition to Mother's Section 388 Petition*

The juvenile court ordered a hearing on mother's section 388 petition. The Agency opposed the petition, arguing that despite completion of her interim case plan services, the court found mother did not benefit from those services and continued to "lack the insight into the significance of her conduct and the profound effect such

6

violence has upon the well[-]being of her children." The Agency argued there remained concerns that mother did not benefit from the domestic violence program she completed in September 2022 due to her persistent involvement in domestic violence events with father that continued to increase in severity. The Agency argued mother's reference to her psychological evaluation and Dr. Tate's assessment that mother could safely parent the minor failed to include a key caveat: that mother could only do so "within 9-12 months *if* she is compliant with the following recommendations," which included individual therapy, PTSD treatment, medication management, domestic violence education, and maintenance of the restraining order against father. As of the writing of the opposition, there was no indication mother had complied with any of Dr. Tate's recommendations.

*November 2024 Addendum Report*

In an addendum report filed November 27, 2024, the Agency reported the minor was hitting other children at school. When the teacher corrected her, the minor said, "Mommy hit [d]addy in the face and he got blood." The minor told her teacher she had seen mother throw a trash can at father's car while she (the minor) was in the car, and that she did not want to visit mother because mother poured water on her head and was mean. The teacher reported the minor used the school's "safe space" often and required a lot of reassurance. When the minor became upset, she reportedly asked for father and was given permission to speak with him on the phone. The minor's caregiver reported the minor had several occurrences of enuresis and encopresis after visiting with mother. The clinician providing case management services to the family expressed concern that visits with mother appeared to cause the minor significant distress as evidenced by emotional dysregulation and enuresis.

*Bonding Assessment Report*

Therapist Linda Lafferty completed a bonding study in November 2024 between mother and the minor. Lafferty concluded that mother was consistent with visitation and

"it has been witnessed that a bond is intact and it would be beneficial continuing the parent/child relationship and would be detrimental to terminate [mother's] parental rights." Lafferty further concluded that the minor would need "support from her paternal and maternal grandparents to promote healing while this process is implemented, for the best interest of [the minor]."

*January and February 2025 Addendum Reports*

In January 2025, the Agency reported the minor was again exhibiting behavioral issues. The minor hit a child in the face at school, fought with her cousin, and spit in a child's face on the bus. When the caregiver spoke with the minor about these incidents, the minor said, "Mommy said it's okay to hit if we don't like someone." The caregiver reported that the minor cried when told she would have to visit with mother after school. The minor had reportedly been telling her attorney and the caregiver that she did not want any more visits with mother. After one visit, the minor became so emotionally distraught that the caregiver called father, who came over to calm the minor (who had soiled her pants).

Following a January 2025 visit, the minor told the caregiver (her paternal grandmother) that "Mommy hates you." The minor was so dysregulated after the visit that she needed to talk with father so he could soothe her before bedtime. After another visit with mother, the minor was unusually sassy toward her grandmother, rolling her eyes, speaking in a condescending and "snotty" manner.

On January 28, 2025, over mother's objection, the juvenile court ordered mother's visits with the minor reduced to one visit per month.

In February 2025, the Agency reported that during a visit while mother and the minor were tickling each other, the minor bit mother on the shoulder. When mother told the minor it hurt and encouraged her to apologize, the minor refused and began to cry. Mother later denied the incident ever happened.

8

*Hearing on Mother's Section 388 Petition and Section 366.26 Hearing*

The hearing on mother's section 388 petition and the section 366.26 hearing commenced on February 11 and 14, 2025. Mother testified that, after the juvenile court terminated her reunification services in May 2024, she continued services by completing 49 of the 52 batterer's treatment classes and taking her anxiety medication. She testified she learned communication tactics, how to identify abuse, how to set and maintain boundaries, and how to keep positive people around her. She started weekly individual counseling with therapist Judy Tarkington in June 2024. Mother further testified she had no relationship with father. She acknowledged there was significant domestic violence in their relationship, which had an impact on the minor. She testified she exposed the minor to domestic violence by arguing with father and creating animosity in the house. However, she denied ever attacking or committing physical violence against anyone and she specifically denied dragging father while he tried to turn off the car ignition (as alleged in the original petition). She denied ever telling the minor it was "okay to hit if we don't like someone." She also denied ever telling the minor she hated the paternal grandmother. Mother testified both she and father abided by the restraining order despite communicating via a talking parents app.

Therapist Linda Lafferty testified regarding her bonding assessment of mother and the minor. Lafferty spent four hours in September 2024 observing mother and the minor together. During the first two-hour visit, mother and the minor interacted well. Mother brought snacks, clothes, and toys and the two played together and snuggled. The minor was connected to mother and said goodbye when they parted. The second two-hour visit went well. Mother brought soup and she and the minor did various activities together. The two were affectionate toward each other. Lafferty testified that the paternal grandmother brought the minor to the second visit and was very frustrated with mother and had very little positive to say about her. Lafferty's review of the visitation logs gave her the overall impression that visits went favorably. She noted the minor once told her,

9

"grandma does not like mommy." When Lafferty asked about father liking mother, the minor said, "No one likes mommy."

Therapist Lafferty opined that the minor had been exposed to domestic violence between mother and father but there was a bond between the minor and mother, the minor had a positive emotional attachment to mother, the bond was beneficial to the minor, and continuing the parental relationship was in the minor's best interest. When asked whether the minor's trauma from being exposed to domestic violence outweighed her emotional attachment and bond with mother, Lafferty stated the minor was confused due to disruptions in her life such as domestic violence and out-of-home placements but it was in the minor's best interest to strengthen her bond with mother "[i]f everyone got therapy and realigned themselves with health and healing." Lafferty testified that termination of mother's parental rights would be detrimental to the minor because the minor is five years old, "knows her mom," and "will always remember her mom and that will cause some angst in her development as she goes through life."

The minor's counsel made an offer of proof that, over the past several months on at least four occasions, the minor was very emotional and expressed frustration with visits with mother. The minor told counsel she did not want to attend visits with mother anymore or, at the very least, wanted visits to be shorter.

At the continued hearing on February 14, 2025, the juvenile court denied mother's section 388 petition, finding she did not meet her burden of showing changed circumstances or that the requested change was in the minor's best interest. Next, the court found the minor was likely to be adopted. With respect to the applicability of the beneficial parental relationship exception, the court considered the minor's age, how long she was exposed to the domestic violence, the portion of her life spent in her parents' care, and the effects of the interaction between the minor and mother. The court found mother demonstrated she consistently visited with the minor but did not demonstrate a positive emotional attachment, termination of which would be detrimental to the minor.

10

The court balanced the severance of parental rights against the benefit of adoption and found any benefit the minor received from her relationship with her parents did not outweigh her need for permanency in a safe and secure adoptive home. The court terminated parental rights and identified adoption as the permanent plan.

## DISCUSSION

### I

### *Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her section 388 petition. She claims the court failed to consider that she completed domestic violence and parenting programs and a psychological evaluation and continued to attend a batterer's program and therapy after services were terminated; she gained significant insight into her domestic violence relationships; and she abided by the restraining order. She further claims the court failed to consider the minor was bonded to her and continuing the relationship was in the minor's best interest. We find no abuse of discretion.

To petition to modify a juvenile court order under section 388, a party must factually allege changed circumstances or new evidence to justify the requested order, and that the requested order would serve the minor's best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner has the burden of proof on both points by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).)

In deciding whether a parent has met his or her burden under section 388, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the continuation of the problem; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents or caretakers. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229.) However, this list is not exhaustive. (*Ibid.*)

The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.) We review the denial of a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Here, regarding evidence of a change in mother's circumstances, mother completed a domestic violence program in September 2022, four months after the minor was initially removed from her (and father's) custody. The minor was returned to the parents' custody in January 2024 with family maintenance services, including a 52-week batterer's program. Just two months later, the juvenile court again ordered the minor detained due to the parents' continued domestic violence. The parents were ordered to complete reunification services including the previously ordered batterer's program. Mother completed a psychological evaluation but did not fully comply with Dr. Tate's recommendation that she engage (or re-engage) in individual therapy, PTSD treatment, medication management, and domestic violence education, and maintenance of the restraining order against father. Even five months after the minor was detained on the section 387 petition, there had been no confirmation mother was engaging in individual therapy, PTSD treatment, or medication management. She last attended the 52-week batterer's program class in late April 2024, yet thereafter continued to have contact with father despite the active restraining order.

Mother testified she acknowledged her past behaviors, including arguing with father and creating "animosity in the house," and she gained insight into those behaviors

12

and was rehabilitated.  At the same time, however, she denied she ever perpetrated any physical violence on father, testimony that was directly contradicted, not only by the minor's repeated statements, but by evidence she dragged father approximately 50 feet with her car (while father held the minor in his arms), threw a trash can at father's car, and vandalized father's home.  The court concluded mother had not done anything significant to address the issues leading to the minor's detention and found she did not meet her burden of showing changed circumstances.

The juvenile court further found that, even assuming mother had shown changed circumstances, she did not demonstrate the requested changes were in the minor's best interest.  Contrary to mother's assertion, the court considered and rejected her claim that the minor was strongly bonded to her such that the minor would benefit emotionally from the requested changes and from what mother learned in her counseling programs. Therapist Linda Lafferty concluded there was a bond between mother and the minor but failed to discuss the concerning reports about the minor experiencing significant distress, including emotional dysregulation, enuresis, and encopresis, after visiting with mother. The court focused on the then five-year-old minor's need for permanency and safety, the fact that the dependency had been ongoing since 2022 and the minor had been in the care of someone other than the parents for over half her life, and the fact that the minor was in a prospective adoptive placement.  On that basis, the court found mother failed to demonstrate the requested changes were in the minor's best interest.

The juvenile court acted well within its discretion in denying mother's section 388 petition for modification.

II

*Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply.  The claim lacks merit.

13

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at pp. 625-626.)

The party claiming the exception has the burden of establishing supporting circumstances. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.*, at p. 636.)

The beneficial parental relationship exception "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*,

11 Cal.5th at p. 630.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the juvenile court determined, and the parties agree, that mother established the first element of the beneficial parental relationship exception—regular visitation. Therefore, we need not address that element further.

Regarding the second element—whether the minor had a "substantial, positive, emotional attachment" to mother such that the minor "would benefit from continuing the relationship" (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636; see *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316-317; *In re J.D.* (2021) 70 Cal.App.5th 833, 852)—mother argues she and the minor shared a substantial and positive bond as demonstrated by the fact that mother met the minor's physical and emotional needs during visits and the minor said she loved mother and asked when she could "go back to my mommy's house." However, mother ignores that, following the filing of the supplemental petition, the minor displayed significant signs of stress before and after visits with mother. Even after mother's visits were reduced to once-weekly monitored visits, and later to one visit per month, the minor exhibited behavioral problems following visits, including hitting and spitting at other children at school. Additionally, the minor repeatedly told the caregiver and her attorney that she did not want to visit mother anymore.

The juvenile court found, based on the evidence, that mother did not share a positive emotional attachment with the minor, given the "chaos of the chronic domestic violence in which the child was exposed." The then five-year-old minor had spent half her life in mother's care being exposed to domestic violence, which the court accurately characterized as "significant," involving a vehicle on more than one occasion. Contrary to mother's assertion, the court did consider the bonding assessment but was not persuaded. As previously noted, the bonding study failed to address the fact that the minor was experiencing significant distress, emotional and physical dysregulation, and was exhibiting behavioral issues, after visiting with mother.

Regarding the third element—whether the attachment was so significant that terminating it would be detrimental to the minor even when balanced against the countervailing benefit of a new, adoptive home (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575)—the juvenile court found that, given the number and severity of domestic violence incidents and the parents' continued engagement in domestic violence acts in front of the minor despite being provided services to address the issue, there was "minimal evidence of a beneficial parental relationship" between the minor and mother (or father) and any existing relationship did not outweigh the minor's need for permanency. Based on the record as we have recounted here, we find no abuse of discretion in the court's finding.

We conclude the juvenile court did not err by finding the beneficial parental relationship exception to adoption did not apply.

DISPOSITION

The juvenile court's orders are affirmed.


/s/<br>
BOULWARE EURIE, J.

We concur:


/s/<br>
ROBIE, Acting P. J.


/s/<br>
RENNER, J.

16